UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

BELINDA MCCARTY,

    Plaintiff,

    v.

PURDUE UNIVERSITY THE TRUSTEES
OF, MARY KATHRYN GREEN-SMITH,
RICK RODRIGUEZ, JULIE KERCHER-
UPDIKE, GERRY MCCARTNEY, GARY
DESAI, DAN RHINE,

    Defendants.

Case No. 4:19-CV-43 JD

## <u>OPINION AND ORDER</u>

This is an employment discrimination case arising out of Plaintiff Belinda McCarty's employment with and termination from Purdue University. Ms. McCarty has sued the Trustees of Purdue University ("Purdue"), and her former superiors, Mary Kathryn Green-Smith, Rick Rodriguez, Julie Kercher-Updike, Gerry McCartney, Gary Desai, and Dan Rhine ("Individual Defendants"), in their individual capacities (collectively "Defendants"). Ms. McCarty alleges that Purdue violated Title VII and the Indiana Minimum Wage Statute and that the Defendants violated the Equal Pay Act, the Family and Medical Leave Act, and the Fair Labor Standards Act. [DE 19]. Before the Court are Plaintiff's Partial Motion for Summary Judgment [DE 45], Defendants' Motion for Summary Judgment [DE 50], and Defendants' Motion to Strike Inadmissible Evidence [DE 60]. Each motion has been fully briefed and is ripe for decision.

## I. FACTUAL BACKGROUND

Ms. McCarty began working in the IT department at Purdue in November 2006. [DE 52-2 at 7]. She maintained the title of "Learning Spaces Initiatives Manager" from the time she was

hired until early 2019 when her title changed to Process Manager. As Learning Spaces Initiatives Manager from 2006 through mid-2010, Ms. McCarty's role included managing a computer laptop program for students, managing the print quota program for students, staff, faculty, and departments at the West Lafayette Purdue campus. In mid-2010, she began managing Purdue's software licensing for Microsoft and effectively became a software licensing administrator. In early 2011, she began managing Purdue's licenses with Adobe and Endnote, and eventually took on additional software licensing products. *Id.* at 10–13.

Jim Myers[1] began working at Purdue in November 1997. [DE 52-4 at 5]. Between 1997 to 2005, he worked as a site operator managing multiple computer labs. In 2005, he was promoted to operator supervisor for computer labs and was promoted again in 2010 to manager for student lab employees. In December 2012, Mr. Myers started working as a software licensing administrator, working alongside Ms. McCarty. *Id.* at 5– 6, 22. It is undisputed that Ms. McCarty and Mr. Myers worked together for just over six years, reported to the same supervisors between 2012 and 2019, performed the same job, and that their salaries during that time were as follows:

| Salaries | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| Myers | $56,998 | $58,138 | $60,027 | $63,028 | $64,919 | $66,542 | $68,705 | $71,453 |
| McCarty | $55,022 | $55,022 | $55,022 | $55,022 | $55,847 | $55,847 | $55,847 | $55,847 |

[DE 52-6 at 2].

Julie Kercher-Updike was the Associate Vice President of Customer Relations in Information Technology ("ITaP") during Ms. McCarty's tenure at Purdue for the time period in question. *Id.* In this role, she had the ultimate decision-making authority regarding merit raises given to approximately 125 employees, including Ms. McCarty and Mr. Myers. *Id.* Beginning in 2013, the salary disparity between Ms. McCarty and Mr. Myers began to grow due to differences

---

[1] Ms. McCarty has identified Mr. Myers as a comparator for purposes of her Equal Pay Act and Title VII claims in this litigation. [DE 19].

in how Mr. Myers and Ms. McCarty were ranked in the ITaP Customer Relations ranking system, which Ms. Kercher-Updike created and oversaw. *Id.* at 3. In this merit-based system, Ms. Kercher-Updike, in consultation with her direct reports, ranked the approximately 125 ITaP Customer Relations employees in order of their performance from highest to lowest. If any employee ranked in the bottom 10% in any given year, they did not receive a merit pay increase. Ms. McCarty ranked in the bottom 10% in 2013, 2014, 2015, 2017, and 2019, and therefore did not receive merit raises in any of those years. Mr. Myers never ranked in the bottom 10% and therefore received a merit raise each year and ranked in the top 25% in 2013, 2014 and 2019. *Id.* The only year that Ms. McCarty did not rank in the bottom 10% was 2016, and she received a merit raise that year. The difference in the size of Ms. McCarty's and Mr. Myers' 2016 merit raise—1.5% of base and 3% of base, respectively—was directly attributable to merit rankings. Mr. Myers' performance rating in 2016 was 3.8 out of 5.0 and Ms. McCarty's was 2.5 out of 5.0. *Id.* at 4.

In the review period between March 2012 through February 2013, Ms. McCarty's overall performance was noted as "Does Not Meet Expectations." [DE 52-2 at 35; 52-3 at 14]. Throughout her time at Purdue, Ms. McCarty was placed on two "Performance Improvement Plans" ("PIP"). The first PIP was initiated by Bryon Reed and began on July 12, 2013 and was extended through November 22, 2013. The second PIP was initiated in 2018 by her then-supervisor Dan Rhine, before her supervisor changed to Kate Green-Smith. [DE 52-2 at 25–26, 33]. In September 2018, Ms. Green-Smith met with her and outlined Ms. McCarty's ongoing deficiencies in her performance and behavior. Ms. Green-Smith wrote a summary of the deficiencies discussed, which Ms. McCarty signed. [DE 55-6 at 5]. Ms. McCarty and Ms. Green-Smith met again for a performance review, which was also outlined in a letter to Ms. McCarty

dated November 2, 20218. [DE 52-3 at 2]. The November 2 letter advised McCarty that this was
her final warning and failure to improve performance within 30 days would result in her
termination from employment. [DE 52-7 at 18]. According to Ms. Green-Smith, she did not see
any significant improvement in Ms. McCarty's performance after this review. *Id.* at 3. Ms.
Green-Smith discussed terminating Ms. McCarty with her supervisor, Rick Rodriguez. *Id.* Mr.
Rodriguez consulted his boss, Ms. Kercher-Updike, who concurred with their decision that Ms.
McCarty should be terminated for poor performance after having been given several chances
over many years to improve. [DE 52-6 at 4]. Ms. Green-Smith terminated Ms. McCarty on
February 6, 2019.[2] The termination letter cites "continued poor performance[,] [d]espite repeated
feedback and performance coaching" resulting in "loss of operational credibility and negative
customer impact" as the reason for her termination. [DE 55-6 at 23]. On April 26, 2019, Ms.
McCarty filed this action and amended her complaint in October 2019. [DE 19].

## II. STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most
favorable to the nonmoving party, making every legitimate inference and resolving every doubt
in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is
not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable
jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986). The party seeking summary judgment "bears the initial responsibility of informing the
district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the

---

[2] Although the letter is dated February 6, 2018, neither party disputes that Ms. McCarty's actual date of termination
was February 6, 2019.

absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this

burden, the nonmoving party may not rest on allegations or denials in its own pleading but must

set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley*

*County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which

means that they "might affect the outcome of the suit under the governing law." *Brown v. City of*

*Lafayette*, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). "If the nonmoving party fails to

establish the existence of an element essential to his case, one on which he would bear the

burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John*

*O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996). Finally, in a case involving cross-motions for

summary judgment, each party receives the benefit of all reasonable inferences when considering

the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390

F.3d 1040, 1045 (7th Cir. 2004).

### III. DISCUSSION

#### A. Count I – Equal Pay Act

Ms. McCarty's Amended Complaint alleges that the Defendants violated her rights under

the Equal Pay Act ("EPA") when they paid her less money than a male counterpart, Mr. Myers,

doing substantially equal work under similar working conditions. Both parties move for

summary judgment on this claim. The EPA prohibits employers from paying employees different

wages based on gender. 29 U.S.C. § 206(d); *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir.

2008). To establish a prima facie case of wage discrimination under the EPA, a plaintiff must

show, by a preponderance of the evidence, that "(1) higher wages were paid to a male employee,

(2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the

work was performed under similar working conditions." *Id.* No proof of discriminatory intent is required. *Id.*; *Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 698 (7th Cir. 2003).

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to establish one of four statutory defenses, "which kick in if the difference in pay is attributed to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Warren*, 516 F.3d at 620; 29 U.S.C. § 206(d). The last exception is a "broad, 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Warren*, 516 F.3d at 620 (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1211 (7th Cir. 1989)). In other words, the EPA establishes a rebuttable presumption of sex discrimination where an employee shows that an employer pays members of one sex less than members of the opposite sex; and the employer can rebut the presumption by offering a gender-neutral justification for doing so. *Id.* at 629. The justification need not be a "good reason," but it has to be bona fide and gender neutral – the employer "cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith." *Id*. Here, the Defendants assert statutory defenses and argue that the difference in salary received by Ms. McCarty and Mr. Myers was based on merit and, in part, seniority, not gender.

The Defendants do not dispute that Ms. McCarty and Mr. Myers had the same job, under the same conditions, between 2012 through 2019, and that Mr. Myers was paid more than Ms. McCarty during this time, essentially conceding that Ms. McCarty has established a prime facie case. [DE 51 at 5; 55 at 6]. Accordingly, the Court need only address the Defendants' statutory defenses. But first, the Court notes that the Defendants argue in their response to Ms. McCarty's motion for summary judgment that the Individual Defendants cannot be subject to a lawsuit for

an alleged EPA violation because they have Eleventh Amendment immunity. The Court need not decide this issue with respect to the EPA claim because regardless of the outcome of that analysis, the Defendants have established a statutory defense and have a bona fide, gender-neutral justification for the compensation disparity.

The Defendants have presented a considerable amount of evidence supporting the fact that Ms. McCarty and Mr. Myers' salary difference was due to merit. First, as explained in more detail below, their salary started out at different places in 2012 due to Mr. Myers' previous jobs at Purdue. Second, beginning in 2013, the salary disparity between Ms. McCarty and Mr. Myers grew due to differences between how they were each ranked in the ITaP Customer Relations merit ranking system created and administered by Ms. Kercher-Updike. Ms. Kercher-Updike had the ultimate decision-making authority regarding the merit raises given to the approximately 125 ITaP Customer Relations employees under her, which included Ms. McCarty and Mr. Myers. In this merit-based system, Ms. Kercher-Updike, consulted with her direct reports and ranked the 125 employees in order of their performance evaluation metrics from highest to lowest. [DE 52-6 at 2]. If an employee ranked in the bottom 10%, like Ms. McCarty did each year but for 2016, they would not receive a merit increase. *Id.* at 3. Mr. Myers never ranked in the bottom 10%, and ranked in the top 25% in 2013, 2104, and 2019, and thus received a merit raise each year. *Id.*  In 2016, when Ms. McCarty did not rank in the bottom 10%, she received a merit raise. The difference in the size of Ms. McCarty's and Mr. Myers' 2016 merit raise—1.5% of base and 3% of base, respectively—was directly attributable to merit. Mr. Myers' performance rating in 2016 was 3.8 out of 5.0 and Ms. McCarty's was 2.5 out of 5.0. *Id.* at 4.

Relatedly, Purdue has presented evidence that Ms. McCarty's poor performance was consistently documented and communicated to her, and ultimately, at least in part, the reason for

her termination. Throughout her time at Purdue, Ms. McCarty's supervisors, including Mr. Rodriguez, Mr. Reed, Mr. Rhine, and Ms. Green-Smith, raised concerns with Ms. McCarty's performance. In the review period between March 2012 through February 2013, Ms. McCarty's overall performance was noted as "Does Not Meet Expectations." [DE 52-3 at 14]. Ms. McCarty was put on two PIPs while at Purdue. In 2013, Mr. Reed placed Ms. McCarty on her first PIP, which indicated several areas of needed improvement including more consistent follow-up with customer requests, keeping her manager informed on work projects, and better communications with other members of the licensing/distribution team. [DE 52-3 at 5–13]. Ms. McCarty was placed on another PIP by her supervisor Mr. Rhine in 2018, citing several examples of deficiencies in performance including failure to communicate important changes with vendors to her managers, inaccurately recording her work time, and telling vendors she was too busy to work with them. [DE 52-7 at 8–16, 25–26, 33]. Conversely, Mr. Myers regularly received successful performance evaluations, was never put on a PIP, and won two merit-based awards in his previous positions. [DE 52-4 at 30].

Ms. McCarty's second PIP was still in place when Ms. Green-Smith became her supervisor in August 2018. In September 2018, Ms. Green-Smith met with her and outlined Ms. McCarty's ongoing deficiencies in her performance and behavior. Ms. Green-Smith documented the deficiencies discussed, which Ms. McCarty signed. [DE 55-6 at 5]. Ms. McCarty and Ms. Green-Smith met again for a performance review, which was also outlined in a letter to Ms. McCarty dated November 2, 20218. [DE 52-3 at 2].  The November 2 letter advised McCarty that this was her final warning and failure to improve performance within 30 days will result in her termination from employment. [DE 52-7 at 18]. According to Ms. Green-Smith, she did not see any significant improvement in Ms. McCarty's performance after this review. *Id.* at 3.

Ms. McCarty has not disputed any of these facts. The arguments she offers in response to this defense are that (1) Mr. Myers and Ms. Green-Smith could not articulate why Ms. McCarty was paid less than Mr. Myers and (2) Purdue failed to respond to a written interrogatory asking for each basis for the pay disparity between Ms. McCarty and Mr. Myers. [DE 53 at 3]. First, Mr. Myers' knowledge of any basis for their pay disparity is irrelevant. As Defendants point out, Mr. Myers was never Ms. McCarty's supervisor or privy to any information regarding her salary or performance reviews. Second, Ms. Green-Smith did testify to a basis for the pay disparity. When asked why it was fair that Ms. McCarty was paid less than Mr. Myers, she stated that:

> [I]f Jim's performance had warranted . . . a higher pay rate, then that is the pay rate that he should get. If Belinda's performance . . . did not merit a merit increase, then the organization shouldn't provide a merit increase, because that provides incentives for employees to perform better. So it is kind of tied to performance. Not to gender.

[DE 47-3 at 5]. Based on this testimony, the Court does not agree with Ms. McCarty's characterization that Ms. Green-Smith failed to articulate a basis for the pay disparity. To the contrary, her testimony explains their salaries increases were based on merit.

Ms. McCarty's main argument in support of denying summary judgment in favor of the Defendants and granting in her favor is a procedural one. She contends that the Defendants failed to respond to a written interrogatory during discovery seeking each basis for the pay disparity between Ms. McCarty and Mr. Myers and therefore has waived the merit system defense because it was "kept hidden" and the Defendants were "hiding the ball for 18 months." [DE 46 at 10; 53 at 3; 57 at 1–4]. Federal Rule of Civil Procedure 26(e) provides that a party who has responded to an interrogatory must supplement or correct its response "in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). If a party fails to provide

information as required by Rule 26(e), "the party is not allowed to use that information . . . to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless." Fed R. Civ. P. 37(c)(1). "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). The determination of whether a failure is harmless or justified is left to the broad discretion of the district court. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The trial court need not make explicit findings regarding a justification or the harmlessness of the Rule 26 violation, however, the court should consider the following factors to determine whether the failure was substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

The Court finds Defendants' failure harmless. First, the Court finds it curious that Ms. McCarty waited until her motion for summary judgment in February 2021 to bring the Defendants' failure to respond to *all* of her interrogatories that were sent in July 2019 to the attention of the Court, particularly when she brought other discovery disputes to the Court in the fall of 2020 as reflected by the docket. Unlike a situation where a party fails to supplement interrogatory answers and the serving party is unaware of this new information, Ms. McCarty has been on notice of Defendants lack of answers for as long as they have failed to provide them. She has indicated that Defendants requested one extension and then offers no further information as to whether any other communications were made regarding the interrogatories. Second, she has not adequately explained to the Court how she was prejudiced by Defendants' failure to answer. Based on the information before the Court, it does not find that Ms. McCarty has been

prejudiced or surprised by Defendants' failure to respond to the interrogatories nor does it find that Ms. McCarty has made a showing that it was done in bad faith. As Defendants point out, their Answer to her Amended Complaint asserted the statutory defenses available to them under the EPA, which included a merit system. Lastly, the Court does not believe Defendants' defense regarding a merit system is one that should cause surprise to Ms. McCarty. Both Ms. Green-Smith and Mr. Myers testified to compensation being tied to quality of job performance. Relatedly, the evidence before the Court shows that Ms. McCarty was repeatedly made aware of her performance issues throughout the period of 2012-2019 and during that period, Ms. McCarty only received one raise. Further, during her deposition, Ms. McCarty was asked a line of questioning regarding the merit system and Ms. Kercher-Updike's ranking process, however, neither party provided the Court with the full line of questioning in the record. [DE 52-2 at 35]. Whether or not the Defendants response to the interrogatory would have provided a more detailed breakdown of the merit-based salaries, the Defendants made known their defense would, in part, include a merit system. Accordingly, after considering all the factors, the Court does not exclude the evidence and information provided by the Defendants pertaining the to merit system.

In her motion for summary judgment, Ms. McCarty argues that Purdue does not maintain a seniority policy and therefore cannot rely on it as a defense. Then inserts a sentence from a Purdue website that states, "The University has no formal seniority system or current union contracts." [DE 46 at 9]. Ms. McCarty cites to a website that contains a document titled "Purdue University Affirmative Action Plan: Gender, Race, Ethnicity, dated October 2020 to September 2021." However, Ms. McCarty does not explain how a document from late 2020 through most of 2021 has any bearing on the relevant time period of 2012-2019. And in her opposition to Defendants' motion, she continues to assert that "Purdue does not have a seniority system," but

cites no evidence in support. [DE 53 at 3]. Ms. McCarty argues that even if Defendants can establish the pay disparity was based on a merit system, that does not explain Ms. McCarty's and Mr. Myers' salary difference in 2012 and the lasting effects of that difference. [DE 53 at 3]. In 2012, when Mr. Myers was hired into the same job as Ms. McCarty, it is undisputed that Mr. Myers was making a yearly salary of $56,998 and Ms. McCarty was making a yearly salary of $55,022. Ms. McCarty argues this $1,976 discrepancy cannot be based on seniority and therefore a violation of the EPA.

However, the Defendants have presented evidence that establish Mr. Myers' employment with Purdue started in 1997 and Ms. McCarty was hired in 2006. Mr. Myers' started at Purdue nine years prior to Ms. McCarty, and during that time, Mr. Myers was promoted twice, once in 2005 and again in 2010. [DE 52-4 at 5–6, 22]. Not only was he promoted but he had several successful performance evaluations in those roles and won two merit-based awards. Even if seniority was not a basis for the slight pay discrepancy in 2012, Mr. Myers had a nine-year head start to earn merit-based raises before Ms. McCarty even began working for Purdue. Ms. McCarty has not presented evidence to create a material factual dispute here. Ms. McCarty's unsupported assertion that Purdue does not have a seniority system does not defeat the undisputed fact that Mr. Myers has been working at Purdue nearly a decade longer than Ms. McCarty and was promoted twice before working in the same position as her. Prior to 2012, Mr. Myers did not have the same job as Ms. McCarty and when he started the same position, his salary did not change from his previous role as manager for student lab employees. [DE 52-4 at 20–21]; *see, e.g. Randall v. Rolls-Royce Corp.*, 742 F. Supp. 2d 974, 987 (S.D. Ind. 2010), *aff'd*, 637 F.3d 818 (7th Cir. 2011) ("Rolls-Royce also maintains that, while these six individuals may have held jobs within the same pay level and grade as [p]laintiff, each had been with the

company for considerably longer tenures than [plaintiff] had" and "each of the males . . . had been with the company for at least ten years longer than [plaintiff], another critical deficiency in [her] claim because seniority is a recognized and accepted defense to a disparate pay claim under the EPA."); *Schutz v. Western Publishing Co.*, 609 F. Supp. 888, 906 (N.D. Ill. 1985) (granting summary judgment to employer on an EPA claim and stating, "[a]n employer may pay newly-hired employees with greater experience more than employees who were newly-promoted to that position, give employees larger raises based on better performance, or base higher wages on an informal seniority system without violating the provisions of the [EPA]."). Lastly, a seniority system is not the only other statutory defense that can account for Mr. Myers salary starting at $1,976 more than Ms. McCarty. While neither party discusses it, the final defense under the EPA is "a differential based on any other factor other than sex." Here, whether or not Purdue has a formal seniority system, it is clear that Mr. Myers' salary was impacted by his successful experience during the nine years before Ms. McCarty began employment. The Court finds this to be a reasonable differential that is not based on sex and does not believe a reasonable jury could conclude otherwise.

Therefore, because the Defendants have established that there is no material fact in dispute and that they have a bona fide gender-neutral justification for the pay disparity between Ms. McCarty and Mr. Myers—merit and seniority—they are entitled to summary judgment as a matter of law on the EPA claim. In turn, Ms. McCarty's motion is denied.

**B. Count II – Fair Labor Standards Act**

Ms. McCarty's Amended Complaint alleges in Count II that the Defendants violated her rights under the Fair Labor Standards Act ("FLSA") when they failed to compensate her for overtime hours she worked because she was not an exempt employee under the FLSA. Both

parties move for summary judgment on this claim. The Defendants first argue that they have Eleventh Amendment sovereign immunity on the FLSA claim and are entitled to summary judgment because neither Purdue nor the Individual Defendants consented to be sued on such a claim. Alternatively, they argue there is no material fact in dispute regarding whether Ms. McCarty's position was exempt from overtime under FLSA. Ms. McCarty argues the Defendants are not entitled to sovereign immunity and argues summary judgment should be granted in her favor because there is no material fact in dispute that she was not an exempt employee under the law, she worked overtime hours weekly, and was not compensated for that work at the required rate. The Court first turns to whether Ms. McCarty can bring suit against the Defendants under the FLSA.

### 1. Purdue's Sovereign Immunity

The Eleventh Amendment to the Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. If properly raised, the amendment bars actions in federal court against a state, state agencies, or state officials acting in their official capacities. *Indiana Prot. & Advoc. Servs. v. Indiana Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (internal citations omitted)); *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 694–95 (7th Cir. 2007).

The question of sovereign immunity for a state university is well developed. "The vast majority of cases considering the issue have found state universities to be forfended by the Eleventh Amendment." *Kashani v. Purdue University,* 813 F.2d 843, 845 (7th Cir. 1987)

(collecting cases). Given this consistency, "it would be an unusual state university that would not receive immunity." *Id.* Further, as relevant here since Ms. McCarty sued the Trustees of Purdue University, many courts have held that the governing bodies of their state universities enjoy the same immunity from suit as the universities themselves. *Peirick*, 510 F.3d at 695 (collecting cases); *see Wellman v. Tr. of Purdue Univ.*, 581 F. Supp. 1228, 1229 n.1 (N.D. Ind. 1984) ("[F]or purposes of Eleventh Amendment immunity, no distinction can, should, or will be drawn between Purdue University and its Board of Trustees."). In deciding whether an entity is an agency of the state, the most important factor is "the extent of the entity's financial autonomy from the state." *Peirick*, 510 F.3d at 695 (finding IUPUI and the Board immune from suit under the Eleventh Amendment). That inquiry is composed of five subparts: (1) the extent of state funding; (2) the state's oversight and control of the entity's fiscal affairs; (3) the entity's ability to raise funds; (4) whether the entity is subject to state taxation; and (5) whether a judgment against the entity would result in an increase in its appropriations. *Id.* at 696.

The Court finds that Purdue is entitled to assert the Eleventh Amendment as a jurisdictional bar. *See Kashani*, 813 F.2d at 845. "[A] crucial question in determining whether the suit should be regarded as one against the state is whether the named defendant has such independent status that a judgment against the defendant would not impact the state treasury." *Id.* (citation omitted). The Board of Trustees of Purdue University is a body corporate created by the Indiana legislature. IC § 21-23-2-2. The Trustees operate Purdue University. IC § 21-27-7-4, 5. Indiana's Budget Agency Law expressly includes Purdue in the definition of "state agency." IC § 4-12-1-2(d) ("the universities and colleges supported in whole or in part by state funds"). As a state agency, Purdue is required to prepare and file a detailed statement of all expenditures it made in the last budgetary period or expects to find necessary in the next budgetary period. IC §

4-12-1-7. The statement must show reasons for all expenditures, "showing particularly the reason for any requested increase or decrease over former appropriations." *Id.* The Budget Agency analyzes the statement and submits its recommendations to the budget committee, which is made up of the budget director, who is appointed by the governor, and members of the Indiana legislature. IC § 4-12-1-3, 8. Thus, Purdue would have to report the payment of a judgment to the legislature as part of its financial report. *Kashani*, 813 F.2d at 846 ("But in view of the fact that Purdue is by design dependent on state appropriations, which are evidently carefully geared through close oversight to meet the changing financial needs of the university, it is apparent that the payment would directly affect the state treasury."). Additionally, as noted in *Kashani*, Purdue does not have the power to levy taxes, and therefore, while it has sources of revenue other than appropriations from the legislature, "it lacks the ability that cities and counties typically have to require payments in the form of taxation."[3] Accordingly, based on consideration of the above factors and Seventh Circuit case law, the Court finds that Purdue is entitled to sovereign immunity under the Eleventh Circuit.

Next, the Court must determine if any of the exceptions to the Eleventh Amendment's bar applies. There are three principal types of exceptions to the Eleventh Amendment's bar. *Indiana Prot.*, 603 F.3d at 371. First, a state may waive immunity by consenting to suit in federal court. *Id*. Second, Congress may abrogate the state's immunity through a valid exercise of its powers under recognized constitutional authority, such as by later constitutional

---

[3] The Seventh Circuit goes on to say:
> [Purdue] can raise money only by entering into one of various markets: the market for bonds, for higher education, for services, and so forth. Paying a judgment in a case like the present is also not one of the purposes for which Purdue is authorized to issue bonds. The absence of the power to tax is a strong indication that an entity is more like an arm of the state than like a county or city, because that enablement gives an entity an important kind of independence. The absence of that authority, for an entity like Purdue, ensures ultimate fiscal reliance upon the state.

*Id.*

amendments. *Id*. Third, under *Ex parte Young,* 209 U.S. 123, 159–60 (1908), a plaintiff may file "suit[ ] against state officials seeking prospective equitable relief for ongoing violations of federal law . . ." *Id*. Ms. McCarty presents no evidence or argument that Congress has abrogated Indiana's sovereign immunity or that she seeks prospective equitable relief.[4] The only exception in dispute is whether Purdue waived its immunity by consenting to suit in federal court.

Waiver must be "stated by the most express language or by such overwhelming implications from the text" as to leave no doubt. *Edelman*, 415 U.S. at 673 (quotations omitted); *see also Mueller v. Thompson*, 133 F.3d 1063, 1064 (7th Cir. 1998) (waiver requires that "the state has made its intention to waive its rights under the amendment clear"). Constructive consent will not overcome the presumption of Eleventh Amendment immunity. *Edelman*, 415 U.S. at 673–74. The Seventh Circuit has more broadly stated that "implicit waivers won't do; the court must be highly confident that the state really did intend to allow itself to be sued in federal court." *Mueller*, 133 F.3d at 1064; *see also Nunez v. Indiana Dep't of Child Servs.*, 817 F.3d 1042, 1045 (7th Cir. 2016) (finding an employee's suit against her state entity employer for violations of the FLSA overtime provisions should be dismissed because the state did not consent or waive immunity to such action). In her response, Ms. McCarty argues that Purdue has waived its sovereign immunity by its "words and deeds." [DE 53 at 5]. She points to Purdue's website explaining that "Purdue is subject to and manages its compensation program in compliance with the [FLSA]." [DE 53 at 5]. However, this argument fails. In 1966, Congress amended the FLSA to cover some state employees, but the Supreme Court held that states retained their Eleventh Amendment immunity from suit by the covered employees. *See*

---

[4] Although Ms. McCarty seeks reinstatement with respect to other counts in the prayer for relief in her Amended Complaint, she asserts that she does not seek injunctive relief by asking the Court to force future compliance with the FLSA. [DE 53 at 7 n.7].

*Employees of Dep't of Pub. Health & Welfare, Missouri v. Dep't of Pub. Health & Welfare, Missouri*, 411 U.S. 279, 285 (1973) (recognizing that the FLSA was binding upon Missouri but nevertheless upheld the State's immunity to a private suit to recover under that Act). In *Alden v. Maine*, the Supreme Court reiterated its holding in *Employees*. *Alden v. Maine*, 527 U.S. 706, 732 (1999); *see also Skillman v. Ivy Tech Cmty. Coll.*, 52 N.E.3d 11, 16 (Ind. Ct. App. 2016) (finding that although state governments must comply with FLSA, they are immune from suits by private individuals for alleged violations of FLSA) (citing *Alden*, 527 U.S. at 732). Claims arising directly under the FLSA may be brought against a state agency only if the state has waived sovereign immunity and consented to suit. *Id.* at 757. Although Purdue is subject to FSLA, it has not waived its immunity by complying with the statute.

Ms. McCarty further argues that Indiana's adoption of its Minimum Wage Statute waives its sovereign immunity with respect to the FLSA because the statutory scheme of that state law is virtually identical to FLSA and it picks up where FLSA coverage leaves off, particularly, that the Indiana Minimum Wage Statute ("IMWS") explicitly covers governmental agencies and political subdivisions. [DE 53 at 5]. However, this argument also fails. In *Mueller*, a Wisconsin statute authorized suits against the state as an employer for overtime pay. 133 F.3d at 1064. The statute also expressly incorporated the FLSA in defining what constituted overtime work. The plaintiff in *Mueller* argued that this chain of provisions causes a waiver of the state's Eleventh Amendment immunity from suit in federal court under the FLSA. *Id.* The Seventh Circuit held that "[t]he fact that the State's labor department has copied the federal overtime provisions into state law does not transform state into federal law, any more than by copying the Federal Rules of Civil Procedure a state turns its procedural code into federal law." *Id.* This is exactly the case here. The IMWS includes similar language as the FLSA with regard to employer's obligation to

pay non-exempt employees one and a half times their regular hourly rate for hours in excess of 40 hours in a single work week. *See* 29 U.S.C. § 207(a); IC § 22-2-2-4(k). Where they differ is the definition of employer. The IMWS includes "the state or other governmental agency or political subdivision . . .  it shall not include any employer who is subject to the minimum wage provisions of the federal [FLSA]." IC § 22-2-2-3. Like in *Mueller*, the state law regarding overtime compensation does not impact Purdue's immunity under the Eleventh Amendment.

Because she has failed to establish that any exception to Purdue's sovereign immunity under the Eleventh Amendment applies, Ms. McCarty's FLSA claim against Purdue must fail. Accordingly, Purdue's motion for summary judgment as to the FLSA claim is granted and the Court need not reach the merits of the claim.

### 2. *Individual Defendants' Sovereign Immunity*

 As previously mentioned, Ms. McCarty brought her FLSA claim against the Individual Defendants as well as Purdue. The Individual Defendants were direct or indirect supervisors of Ms. McCarty throughout her time at Purdue and were sued in their individual capacities. [DE 19]. The Individual Defendants argue that Ms. McCarty's attempt to hold them liable fails for similar reasons—sovereign immunity. The Individual Defendants argue they are entitled to summary judgment on this claim because they are deemed to be an extension of Purdue, and thus cannot be sued without waiver or consent, relying on *Luder v. Endicott*, 253 F.3d 1020 (7th Cir. 2001), where the Seventh Circuit addresses the application of the Eleventh Amendment as a bar to an action under the FLSA by state employees against their supervisors in an individual capacity suit.

In *Luder*, the plaintiffs, employees of a state prison, brought an action under the FLSA against the warden, deputy warden, and personnel officers of the prison in their individual

capacities. 253 F.3d at 1022. The Court held the employees were immune from suit even in their individual capacities. The plaintiffs alleged that they were forced to work fifteen minutes before and after their official shifts without pay. *Id.* at 1024–25. The FLSA defines "employer," to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §203(d). The Seventh Circuit in *Luder* acknowledges that this definition has been interpreted to mean that "the supervisor who uses his authority over the employees whom he supervises to violate their rights under the FLSA is liable for the violation." *Luder*, 253 F.3d at 1022. The application of the Eleventh Amendment to suits against state officials in their individual capacity depends on the circumstances. The "general rule" is that such suits are not barred by the amendment, because the plaintiff is seeking damages from individuals rather than from the state treasury. *Id.* at 1022–23 (citing *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991); *Alden*, 527 U.S. at 757 (an FLSA case); *Papasan v. Allain*, 478 U.S. 265, 278 n.11 (1986); *Kentucky v. Graham*, 473 U.S. 159 (1985); *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998)). The *Luder* Court cited examples to illustrate that the Eleventh Amendment does not protect the states against every expense or inconvenience that the suability of their employees in federal court for violations of federal law might visit upon the states. *Id.* at 1023. Examples of situations which do not give rise to the Eleventh Amendment bar include a state's decision to indemnify its employees because it is "irrelevant" as it is "the voluntary choice of the state, not a cost forced on it by the federal-court suit", or competition causing the state to pay higher wages to its employees due to their exposure to a federal lawsuit than if they had blanket immunity from lawsuits in federal court. *Id.*

Nonetheless, the court also emphasized that "even when a suit is against a public officer in his or her individual capacity, the court is obligated to consider whether it may really and

substantially be against the state." *Id.* (citing *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 270 (1997); *Ysleta Del Sur Pueblo v. Laney,* 199 F.3d 281, 286 (5th Cir.). The court stated:

> [A] suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act. Indirect effects are not enough; otherwise the practical necessity for a state to compensate an employee for bearing liability risks would place individual-capacity suits under the bar of the Eleventh Amendment. But a suit nominally against state employees in their individual capacities that demonstrably has the identical effect as a suit against the state is, we think, barred. Any other position would be completely unrealistic and would make a mockery of the Supreme Court's heightened sensitivity to state prerogatives.

*Luder,* 253 F.3d at 1023 (emphasis in original) (internal citations omitted).

The Individual Defendants argue that a judgment against them would be substantially against Purdue and therefore under *Luder*, they are immune. However, other than that the judgment would "expend itself on the public treasury or domain," presumably because Purdue would indemnify the individuals, the Individual Defendants make no argument that a judgment on Ms. McCarty's FLSA claim would "interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act," which were present in *Luder*. In fact, unlike *Luder*, Ms. McCarty specifically notes that she is not seeking injunctive relief by asking the Court to force future compliance with the FLSA. Further, in *Luder*, the 145 plaintiffs were current employees and a judgment against the individual defendants would ultimately mean the state had to pay employees the additional wages or else discontinue the policy of making employees work before and after each shift. *Id.* at 1022–23. In contrast, Ms. McCarty is seeking back unpaid overtime compensation and it does not interfere with the public administration or restrain Purdue from acting or compel it to act. Additionally, as Ms. McCarty points out, while not unsubstantial, a judgment in Ms. McCarty's favor under the FLSA would amount to a damages award of $29,278. [DE 53 at 7]. By contrast in *Luder*, while

21

the court indicated that the damages were unknown, it noted the damages "obviously exceeds the ability of these four defendants to pay (remember there are 145 plaintiffs)" and that it will thus "not be an *option* for the state to indemnify them." 253 F.3d at 1024 (emphasis in original). Unlike *Luder*, the Individual Defendants inability to pay a judgment is not a guarantee nor have the Individuals Defendants made any argument of this nature. And as *Luder* makes clear, Purdue's voluntary choice to indemnify the Individual Defendants is irrelevant because it is not a cost forced on it by the federal-court suit. Lastly, the Seventh Circuit noted that *Luder*'s fact pattern "is not a scenario found in any of the cases that have rejected an Eleventh Amendment defense to individual-capacity suits." *Id.*

Therefore, because the Individual Defendants failed to establish that a judgment against them under Ms. McCarty's FLSA claim is substantially the same as a judgment against Purdue, they are not immune from suit on this claim. Accordingly, the Court moves to the merits of the FLSA claim against the Individual Defendants.

### 3. FLSA Claim against Individual Defendants

"The principal congressional purpose in enacting the [FLSA] was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)). The FLSA requires employers to pay overtime for any hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). But the overtime requirements do not apply to "exempt" employees, such as "any employee employed in a bona fide executive, administrative, or professional capacity[.]" *Id.* § 213(a)(1). An "employee employed in a bona fide administrative capacity" is one who is compensated on a salary basis;

whose primary duty is the performance of office or non-manual work directly related to the

management or general business operations of the employer or the employer's customers; and

whose primary duty includes the "exercise of discretion and independent judgment with respect

to matters of significance." 29 C.F.R. § 541.200(a)(1)-(3).

When evaluating a claimed exemption, the court must conduct "a thorough, fact-intensive

analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly

& Co.*, 679 F.3d 560, 572 (7th Cir. 2012). As a remedial statute, the exemptions are narrowly

drawn against the employers. *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 660 (7th Cir.

2011); *see also Schaefer-LaRose*, 679 F.3d at 571; *but see Yi v. Sterling Collision Centers, Inc.*,

480 F.3d 505, 508 (7th Cir. 2007) (the principle of narrow interpretation does not raise the

defendant's burden of proof beyond a preponderance of the evidence; it merely serves as "a tie

breaker."). "Determining the duties encompassed by an employee's position is a question of fact;

determining the appropriate FLSA classification is a question of law." *Roe-Midgett v. CC

Services, Inc.*, 512 F.3d 865, 869 (7th Cir. 2008).

Here, Ms. McCarty alleges to have worked on average 50 hours a week during her

employment at Purdue. She argues she is entitled to at least one and half times her hourly wage

for the 10 overtime hours she worked per week. Mr. McCarty asserts that her job as a software

licensing administrator does not fall under the administrative FLSA exemption because it did not

involve "the exercise of discretion and independent judgment with respect to matters of

significance." Conversely, the Individual Defendants argue that Ms. McCarty's role falls into

both the administrative and professional exemption under the FLSA and therefore is not entitled

to overtime compensation. Neither party disputes that she was compensated on a salary basis nor

23

do they dispute that Ms. McCarty's role involved non-manual work directly related to the

management or general business operations of the employer or the employer's customers.

First, the Court addresses the administrative exemption. The parties dispute whether Ms.

McCarty exercised discretion and independent judgment with respect to matters of significance

in her role at Purdue. The phrase "discretion and independent judgment" must be applied in light

of all the facts involved in the particular employment situation in which the question arises. 29

C.F.R. § 541.202(b). The term "matters of significance" refers to the level of importance or

consequence of the worked performed. *Id.* § 541.202(a). Ms. McCarty argues she did not

exercise discretion and independent judgment in her job and to the extent she did, it was not on

matters of significance. To support this, Ms. McCarty cites evidence that any decisions she

made, for example, decisions about software packages and distributions, were not independent

decisions but rather recommendations that were standardized and required her supervisor's

approval. She also cites to Ms. Green-Smith's testimony that Ms. McCarty did not exercise

independent judgment on matters of significance because "all of the decisions still needed to go

through [her], and then [she] would need to seek approval from either [her] supervisor or [her]

leadership team or procurement, depending on the nature of the decision." [DE 47-3 at 7]. Ms.

Green-Smith testified that she herself could not exercise independent judgment either. *Id.*

However, as the regulations note, "employees can exercise discretion and independent judgment

even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. §

541.202(c). Ms. McCarty argues that Ms. Green-Smith's testimony that Ms. McCarty's

distribution "decisions" "would impact Purdue's bottom line" do not make her exempt because

the regulations state "[a]n employee does not exercise discretion and independent judgment with

24

respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." *Id.* § 541.202(f).

On the other hand, the Individual Defendants devote a great deal of their motion for summary judgment citing to evidence that supports their position that Ms. McCarty's job involved discretion and independent judgment on matters of significance. [DE 51 at 15–18]. This evidence includes, but is not limited to, another portion of Ms. Green-Smith's testimony that indicates Ms. McCarty and Mr. Myers made decisions of significance "based off of their assessments of agreements, their experience, and kind of what the customer needed, they would provide recommendations to me and/or make those decisions themselves, depending on the case." [DE 47-3 at 6]. She went on to testify that the types of decisions they made themselves were "[h]ow to package the software for distribution" and they would "figure out the most efficient way and secure way to distribute the software, so that we were in line with our agreements." *Id.* There is also evidence that Ms. McCarty managed Purdue's software licensing for Microsoft, a multi-million-dollar agreement, addressed work tickets, and handled contract related work. [DE 51 at 15–16]. Mr. Myers also testified to making decisions on matters of significance in his job. *Id.* at 16–17. He testified that those decisions are "reviewing and citing issues [] of products" and making "decisions on how products are distributed, which affect the users of those products, and . . . the timing of renewals to make sure things are done at the proper times so there's no impact to our users." [DE 52-4 at 17]. Ms. McCarty and Mr. Myers were empowered to have "initial conversations" to try to "get a better price on renewal costs" and "[i]f there were any terms that were problematic, [they] would discuss it with the vendor and try and get the terms clarified or excised." *Id.* at 16.

Significantly, neither party relies on much or any case law in support of their arguments. Rather, they rely on the evidence. While the Individual Defendants have identified a variety of facts that suggest Ms. McCarty's primary duties involved the exercise of discretion and independent judgment, Ms. McCarty has raised several factual disputes to contest whether these decisions related to any matters of significance at Purdue or were in fact discretionary and independent. For instance, the parties dispute whether decisions regarding software packages and distributions were standardized and required a supervisor's approval or whether Ms. McCarty made independent decisions regarding the contracts with customers or instead, was following the instructions from supervisors. [DE 55-5 at 7–10; 46 at 14; 53 at 8–10]. Further, it is disputed whether Ms. McCarty made decisions as to whether a particular customer is entitled to access to a product or software. [DE 53 at 10; 52-4 at 27–28]. When construing all reasonable inferences in favor of both parties, the record before the Court includes differing testimony about Ms. McCarty's relative freedom from supervision, whether she exercised discretion, and if so, the importance of those decisions and therefore, there is a genuine issue of material fact as to whether Ms. McCarty qualifies for the FLSA's administrative exemption making summary judgment for either party inappropriate on this issue. *See Young v. Harvest Land Co-Op*, Inc., 2020 WL 2539366, at *12 (S.D. Ind. May 19, 2020) (finding material facts in dispute as to whether the plaintiff exercised discretion and independent judgment on any matters of significance at her employer).

Next, the Court addresses the Individual Defendants bare bones argument that Ms. McCarty's role at Purdue fell under the professional exemption. An "employee employed in a bona fide professional capacity" is one whose compensation is on a salary basis; and whose primary duty is the performance of work requiring knowledge of an advanced type in a field of

science or learning customarily acquired by a prolonged course of specialized intellectual instruction or requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor. 29 C.F.R. § 541.300(a)(1)-(3). In their motion for summary judgment, the Individual Defendants state in a conclusory manner that Ms. McCarty falls under the FLSA professional exemption without presenting evidence or argument as to why this exemption should apply to her. Consistent with the regulations, a professional exemption can also include "work requiring advanced knowledge" which is defined to mean work "which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment. . . . An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id.* § 541.301(d). The regulations also provide several areas of work that fall under the "learned professional" exemption, none of which apply here: registered medical technologists, nurses, dental hygienists, physician assistants, accountants, chefs, paralegals, athletic trainers, and funeral directors. *Id.* § 541.301(e)(1)–(9). Further, the regulations note that this exemption does not apply to occupations where employees have "acquired their skill by experience rather than by advanced specialized intellectual instruction." *Id.* § 541.301(d). However, aside from the arguments relating to discretion and judgement as they pertain to the administrative exemption, the Individual Defendants have not presented any argument or evidence to support that Ms. McCarty's job falls under the professional exemption and therefore, any arguments other than the bare bones assertion made in their motion for summary judgment, which are insufficient, are waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district

court are waived on appeal."). Accordingly, their motion for summary judgment as to the professional exemption is denied.

Lastly, the parties dispute whether Ms. McCarty actually worked on average approximately 50 hours per week. Ms. McCarty presented evidence suggesting a varied work schedule: sometimes working between 60 and 80 hours in a single workweek, sometimes 40-60 hours a week, but on average approximately 50 hours per week [DE 47-1 at 13–16]. The Individual Defendants presented contradictory evidence, that Ms. Green-Smith was not aware of Ms. McCarty regularly working outside of normal business hours, indicating that she only worked 40 hours a week [DE 47-3 at 7; 55-5 at 17]. Mr. Myers' similarly testified that he would receive emails from Ms. McCarty during hours he would not expect her to be in the office [DE 55-4 at 18–19], however, this does not amount to evidence that she worked 10 hours of overtime per week or even that she worked more than 40 hours per week. Additionally, her claims are contradicted by a performance review that indicates "it has also been observed that your work schedule falls short of the expected 40-hour workweek while your performance is not meeting expectations. You are expected to fulfill a minimum of 40 hours during each week. If work is being done outside the office, it needs to be preapproved and documented." [DE 55-3 at 32]. Thus, the Court finds material facts in dispute as to whether Ms. McCarty worked in excess of 40 hours, as required under FLSA to warrant overtime compensation.

Accordingly, the cross-motions for summary judgment on the FLSA claim are denied.

## C. Count III - Indiana Minimum Wage Statute ("IMWS")

Ms. McCarty's Amended Complaint also alleges that Purdue violated the IMWS when it failed to compensate her for the hours she worked overtime because she was not exempt under any exemption with the IMWS. Both parties have moved for summary judgment on this claim.

28

For the same reasons Ms. McCarty asserts that Defendants violated her rights under the FLSA, she asserts they violated her rights under the IMWS.  "The FLSA is the federal analogue of the [IMWS]." *Richardson v. Town of Worthington*, 44 N.E.3d 42, 44 (Ind. Ct. App. 2015). She argues her job was not exempt under the IMWS and she was not compensated at the rate of one and a half times her regular hourly rate for all hours worked over 40 in a single workweek. Ms. McCarty further argues in a footnote that while Purdue is bound by the FLSA, if it is determined that Purdue is not covered by FLSA, then it is covered by IMWS, for which the legal analysis and remedy is the same. [DE 46 at 12 n.7]. The IMWS defines "employer" as follows:

> any individual, partnership, association, limited liability company, corporation, business trust, the state, or other governmental agency or political subdivision . . . . However, it shall not include any employer who is subject to the minimum wage provisions of the federal [FLSA].

IC § 22–2–2–3. Purdue cites *Skillman*, an Indiana Court of Appeals case, throughout its briefing in support of its argument that motion for summary judgment must be granted in its favor on this claim because that court held that "[the state] is not an "employer" for purposes of the [I]MWL because it is 'subject to' FLSA requirements, even if [the plaintiff] cannot personally enforce FLSA requirements against [the state]. 52 N.E.3d at 16. This holding applies here. As the Court found above, Purdue is subject to the FLSA, but is immune from suit. *See Employees*, 411 U.S. at 285 (recognizing that the FLSA was binding upon Missouri but nevertheless upheld the State's immunity to a private suit to recover under that Act); *Alden*, 527 U.S. at 732 (reiterating its holding in *Employees*).

Ms. McCarty has made no attempt to respond to Purdue's argument. She did not offer any argument in her reply in support of her motion for summary judgment nor in her response in opposition to Purdue's motion for summary judgment. Accordingly, any other arguments are waived. *See Puffer*, 675 F.3d at 718 ("It is a well-established rule that arguments not raised to the

district court are waived on appeal."). Because Purdue is subject to FLSA, Ms. McCarty does not have a cause of action under the IMWS. Therefore, Ms. McCarty's motion for summary judgment on the IMWS claim is denied and Purdue's motion for summary judgment on the claim is granted.

### D.  Count IV – Family and Medical Leave Act

Ms. McCarty's Amended Complaint alleges that the Defendants violated the Family and Medical Leave Act ("FMLA") by unlawfully discriminating and retaliating against her by terminating her, at least in part, for using FMLA leave. While her Amended Complaint does not specify the FMLA provisions, Ms. McCarty argues retaliation arising out of instances of both the family-care (29 U.S.C. 2612(a)(1)(A)-(C)) and self-care (29 U.S.C. 2612(a)(1)(D)) provisions of the FMLA. [DE 53 at 13–14; 19]. Only the Defendants move for summary judgment on this claim. Before reaching the merits of Ms. McCarty's FMLA claim, the Court must first address Defendants' argument that they have Eleventh Amendment immunity and are immune from suit under the FLMA, just as they did under the FSLA claim. However, Defendants seemingly abandon this argument under the FMLA claim in their reply by failing to address Ms. McCarty's argument in response. Nonetheless, the Court will address it.

In her response, Ms. McCarty argues that Eleventh Amendment sovereign immunity does not apply here because Congress has abrogated states' immunity under the FMLA and state employees may recover money damages in federal court in the event of the state's failure to comply with the family-care provision of the FMLA. *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 725 (2003); *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 930 (7th Cir. 2020) (recognizing the Supreme Court's holding in *Hibbs*). Conversely, the Supreme Court has held that Congress did not validly abrogate sovereign immunity under the self-care provision of the

FLMA. *Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30, 43–44 (2012) (holding that Congress did not validly abrogate states' sovereign immunity from suits for money damages in enacting FMLA's self-care provision, requiring employers, including state employers, to allow employees to take unpaid leave to care for their own serious health conditions); *Toeller v. Wisconsin Dep't of Corr.*, 461 F.3d 871, 879 (7th Cir. 2006) (holding the plaintiff cannot use the self-leave provision of the FMLA in his suit for money damages against an arm of the state). Ms. McCarty argues that she was retaliated against for using FMLA for instances of both self-care and family-care, which Defendants do not dispute. [DE 53 at 13–14]. Accordingly, consistent with *Coleman*, and the analysis in Section III.B.1 regarding Purdue' sovereign immunity, the Court finds that Purdue is entitled to sovereign immunity as to her self-care instances of FMLA leave. However, because the state's immunity has been abrogated by Congress under the FMLA family-care provisions, Purdue is not entitled to immunity regarding the claims that it retaliated against Ms. McCarty for using family-care leave under the FMLA.

Ms. McCarty further argues that the Individual Defendants are not entitled to sovereign immunity on the self-care provision of the FMLA. However, before the Court can reach the sovereign immunity question, it must first determine if there is individual liability under the FMLA. Ms. McCarty argues the Individual Defendants are employers as defined under the FMLA, which can include "any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer." 29 C.F.R. § 825.104. The Seventh Circuit has recognized that the FMLA's definition of "employer" encompasses some individual liability. *Eppinger v. Caterpillar Inc.*, 682 F. App'x 479, 481 (7th Cir. 2017) (unpublished); *see also Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 610 n.2 (7th Cir. 2001) (implying that FMLA liability for individuals is possible).

"The Seventh Circuit has not supplied a test for assessing individual liability under the FMLA" but "[t]he FLSA's definition of 'employer' is 'materially identical' to the FMLA's definition." *Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, 2020 WL 1986965, at *9 (N.D. Ill. Apr. 27, 2020) (internal quotations omitted). Under the FLSA, an individual qualifies as an "employer" if she "had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987). Given their materially identical definitions of "employer," the FLSA test governs the scope of individual liability under the FMLA as well. *See Katz*, 2020 WL 1986965, at *9; *Freemon v. Foley*, 911 F. Supp. 326, 330–31 (N.D. Ill. 1995). It is undisputed that the Individual Defendants had "supervisory authority" over Ms. McCarty and would be responsible for the alleged violation and therefore the Court reaches the immunity question. For the same reasons discussed in Section III.B.2, the Court finds that unlike Purdue, the Individual Defendants do not enjoy sovereign immunity as to the self-care instances under the FLMA claim. With this finding, the FMLA claim against the Individual Defendants, under the self-care and family-care provisions of the FLMA, can advance. Therefore, the Court moves to the merits.

The FMLA "makes it unlawful for an employer to retaliate against an employee who exercises his FMLA rights." *Carter v. Chcago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). To establish a claim for FMLA retaliation, a plaintiff must show "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). To determine causation between an FMLA-protected activity and an adverse action, the Court will "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*,

872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz v. Werner Enterprises, Inc*. 834 F.3d 760, 764-766 (7th Cir. 2016)).

The Defendants do not dispute the first two elements—Ms. McCarty engaged in protected activity by taking FMLA leave, and her termination was an adverse employment action. The only question that remains is whether those two are connected. To establish that element, a plaintiff "does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotations omitted). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008). To make this showing, a plaintiff can rely on direct or circumstantial evidence, including "suspicious timing" and "ambiguous statements from which a retaliatory intent can be drawn." *Pagel*, 695 F.3d at 631.

The Court finds that there is sufficient evidence from which a reasonable jury could find that Ms. McCarty's use of FMLA leave was, at least in part, a motivating factor in her firing. First, during the various periods that Ms. McCarty was away from work on FMLA leave, she was repeatedly required to do work that interfered with her leave. In 2010 and 2011, when Ms. McCarty was on leave for the birth of her children, she was required to work, answering questions from Mr. Reed and was required to come into the office a few times. [DE 54-1 at 1–2]. While providing care for her father after his open-heart surgery in 2015, Ms. McCarty was required to continue doing work from her laptop in the hospital, but still used FMLA during that time. *Id.* at 2. Second, Ms. McCarty has presented evidence that there were statements

suggesting that the Defendants viewed her requests for leave with disfavor and may have held it against her. Two of her supervisors, Mr. Rhine and Mr. Rodriguez, criticized her use of leave with comments such as "[w]ow, you're out another day?" or "[d]id you really need to go to that?" [DE 54-2 at 2]. Ms. McCarty further testified that Ms. Green-Smith told her she was taking too many days off for her own personal illness and that she needed to be in the office more. *Id.* at 3, 5. In April of 2018, Ms. McCarty took leave to care for and be with her dying father. *Id.* at 4. During that leave, Mr. Rhine required Ms. McCarty to do work. He told her it was expected because the department was up against contract renewal dates. Despite this, Ms. McCarty's supervisor still requested that the time be entered as FMLA leave, and Ms. McCarty complied in fear of further retaliation. *Id.* at 4–5. In April 2018, Mr. Rhine and Mr. Rodriguez separately expressed to Ms. McCarty that they expected her to work even when she was not at the office. *Id.* at 5. Ms. McCarty understood these comments to be direct or indirect threats to her job if she did not continue to work even while on protected leaved under the FMLA. *Id.*

Third, Ms. McCarty also asserts that her performance improvement plans came "right on the heels" of her use of leave. Ms. McCarty took 8 weeks of leave in 2012 but was expected to complete the same amount of work in that year as if she had not taken leave and received criticism for this in her yearly performance evaluation. *Id.* at 6; [DE 47-4 at 7]. She testified that this is why she was placed on a PIP the following year. [DE 54-2 at 6]. Additionally, the PIP that Mr. Rhine implemented in May 2018 through August 2018 came right after Ms. McCarty took intermittent leave under the FMLA for the care and companionship for her dying father. Ms. McCarty argues it was this PIP that was leveraged by Ms. Green-Smith in her ultimate termination. Fourth, Ms. Green-Smith terminated Ms. McCarty on her first day back from FMLA leave. Fifth, Ms. McCarty argues that her husband previously sued Purdue for violations

of FMLA, and that action continued into June 2017. During that time, the McCartys both reported to Ms. Kercher-Updike, who presided over the rankings of employees under her supervision and had the decision-making authority to give or withhold merit-based raises.

Considering the evidence as a whole, and in the light most favorable to Ms. McCarty, a reasonable jury could find that her supervisors' comments regarding her various FMLA leave could be evidence of retaliation. *See Goelzer*, 604 F.3d at 994–96 (finding that a boss' comments indicating displeasure with the employee's absences could support a retaliation claim where those absences were protected by the FMLA). Further, consistent with *Goelzer*, the instances that Ms. McCarty was told to stop taking leave or required to work while on leave could indicate a degree of hostility towards, or a lack of amenability to, Ms. McCarty's requests for and taking leave, which could further support a finding that Ms. McCarty's use of that leave motivated her firing. The timing of her termination relative to Ms. McCarty's leave also suggests that the two may be connected. The Seventh Circuit has held that such close temporal proximity can be evidence of retaliation. *King v. Preferred Tech. Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) (finding sufficient evidence of causation where the employer fired the employee one day after she completed her leave of absence). A jury could find from these facts that Ms. McCarty's FMLA leave was a motivating factor in her firing.

The Defendants respond by arguing that Ms. McCarty was actually fired because of her continued poor performance. The Court relies on the detailed discussions of this evidence under Section III.A. *See Goelzer*, 604 F.3d at 995 (stating that when a plaintiff presents evidence of retaliation, "the case must proceed to trial unless the employer presents unrebutted evidence that it would have taken the adverse action against the plaintiff even if it did not have a retaliatory motive."). A jury could certainty find on this record that Ms. McCarty failed to improve her

performance after several warnings and this failure would have resulted in her firing independent of any other improper reasons. The Court cannot conclude, however, that a jury would have to reach those conclusions such that summary judgment would be warranted, particularly because retaliation need only be a motivating factor in an adverse action, not the only factor or even the main factor, to support a retaliation claim. As noted above, not only is there evidence of hostility toward Ms. McCarty's FMLA leave but also evidence that the FMLA leave could have caused supervisors to retaliate through the use of PIP, which in turn became a basis for which the Defendants relied on for her termination. Therefore, the Court finds that there is a genuine factual dispute over whether Ms. McCarty's leave under the FMLA was at least a motivating factor in her firing, even if her poor performance was also a substantial factor and thus, must deny the Defendants' motion for summary judgment as to the FMLA retaliation claim.

### E. Count V – Title VII

Ms. McCarty's Amended Complaint alleges that Purdue violated her rights under Title VII because it paid her substantially less than a similarly situated male employee and the disparate treatment was based on her gender. As a preliminary matter relating to this claim, the Court addresses the Defendants' pending motion to strike inadmissible evidence. The Defendants move to strike certain evidence designated by Ms. McCarty in her Brief in Opposition to Defendants' Motion for Summary Judgment ("Response"). [DE 60]. In support of this motion, Defendants argue that Ms. McCarty offers arguments predicated on information that is inadmissible hearsay evidence under Federal Rule of Evidence 802. In support of her Title VII claim, Ms. McCarty's Response cites to many online publications and newspaper articles to which she provides hyperlinks. These articles, as Ms. McCarty argues, are provided as background information for the prevalence of sex discrimination in the technology sector. [DE

61 at 1]. She further argues that the references "provide helpful background information when evaluating why it might be true that McCarty and Myers' supervisors would have in-person engagements with Myers but would eschew the same with McCarty" and the Court should take judicial notice of the articles. *Id.* at 2.

"To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (quoting *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)). "A party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015) *aff'd in part,* 830 F.3d 735 (7th Cir. 2016). As the Seventh Circuit has specifically noted, "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014).

The Seventh Circuit has held that news articles are inadmissible hearsay evidence when offered to prove a particular fact of a plaintiff's case. *See Chicago Firefighters Loc. 2 v. City of Chicago*, 249 F.3d 649 (7th Cir. 2001), *as amended* (May 25, 2001) (finding the court "need not consider the legal standing of the argument, however, because it lacks adequate factual support [since the] evidence consists of a newspaper article, which is inadmissible hearsay on the point"). Ms. McCarty does not dispute that newspaper articles are hearsay. Nor has she offered a non-hearsay reason for offering the articles. The Defendants argue, and the Court agrees, that within

the same breath of asserting that the articles are meant for background information only, Ms. McCarty asserts that the articles tend to show that she was excluded from certain management meetings due to her gender and the prevalence of a "boys club" at Purdue. With that admission, the Court finds that Ms. McCarty is offering the articles as out of court statements for the truth of the matter asserted—the prevalence of gender discrimination in the technology sector as proof that Ms. McCarty was subject to gender discrimination at Purdue—and is therefore hearsay.

Ms. McCarty's only argument in opposition is that the Court should take judicial notice of the articles to provide background, citing non-binding caselaw. However, the evidence offered here is distinguishable from those cases. In *Pérez*, the Court took notice of a medical procedure from an internet medical source (Mayo Clinic) as an aid to its inquiry. *Pérez v. Saint John's Sch.*, 814 F. Supp. 2d 102, 111 n.7 (D.P.R. 2011). In *Chhetry*, the court found no error in the Board of Immigration Appeals taking administrative notice of news articles on current events in a foreign country bearing on an applicant's well-found fear of persecution. *Chhetry v. U.S. Dep't of Just.*, 490 F.3d 196, 199 (2d Cir. 2007). And lastly, in *Sprint*, the court took judicial notice of a news article regarding when Sprint had the ability to sell the iPhone, noting that this fact adds plausibility to its allegation. *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 325 n.29 (D.D.C. 2011). However, the facts in the news articles in *Sprint* could easily be presented in admissible form at trial. The Court does not find Ms. McCarty's citations to be persuasive. Further, even if the news articles were considered, they do not contain any facts indicating that Ms. McCarty was discriminated for her gender by Purdue. *See Clancy v. Off. of Foreign Assets Control of U.S. Dep't of Treasury*, 2007 WL 1051767, at *13 (E.D. Wis. Mar. 31, 2007), *aff'd,* 559 F.3d 595 (7th Cir. 2009). Accordingly, Defendants' motion to strike Ms. McCarty's

designated evidence of news articles in her Response is granted and the Court does not consider those articles. [DE 60].

The Court next moves to the merits of Purdue's motion for summary judgment on the Title VII claim. "Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). "At the summary-judgment stage, the proper question is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Disparate compensation has been recognized as an adverse employment action when a plaintiff establishes that she has received lower compensation than a "similarly situated" nonprotected class member. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004) (listing the third element of a discrimination *prime facie* case as suffering "an adverse employment action in that she was paid a lower salary than a "similarly situated" nonprotected class member"); *Cullen*, 338 F.3d at 703 (analyzing a Title VII disparate pay claim).

When reviewing discrimination claims, the Court recognizes that the *McDonnell Douglas* framework analysis is no longer required and is now viewed simply as one way to organize and present a claim of discrimination. The Seventh Circuit has stated that plaintiffs do not have to rely on the *McDonnell Douglas* method to carry that burden and if she does not, she must provide either "direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll*, 953 F.3d at 929 (citation omitted). Plaintiffs may point to "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the

protected characteristic; and dishonest employer justifications for disparate treatment." *Id.* And as the Seventh Circuit has recognized, "[f]ew discrimination cases are so straightforward—indeed they are often factually complex and require sifting through ambiguous pieces of evidence." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . . Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* With a Title VII claim, the "fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014).

Ms. McCarty has alleged that Purdue discriminated against her on the basis of her gender by paying her substantially less than a similarly situated male employee, Mr. Myers, and would not have subjected her to this disparate treatment but for her gender. Ms. McCarty also argues that she received disparate treatment in other terms and conditions, however, presents no evidence to support these claims except for the evidence the Court has stricken. [DE 53 at 3–5]. Purdue frames its motion under the *Ortiz* "reasonable factfinder method," arguing that no reasonable factfinder could conclude that the evidence shows that Ms. McCarty was subjected to discrimination on account of gender. [DE 51 at 10]. When viewing the evidence in the light most favorable to Ms. McCarty, she has not offered evidence that, when viewed as a whole, permits an inference of discrimination. *See Ortiz*, 834 F.3d at 765. Simply put, Ms. McCarty has offered no evidence that her gender had anything to do with the difference in salary with Mr. Myers or her termination. And, even if Ms. McCarty was right that she was left off emails or out of meetings

by supervisors, nothing suggests that this was a result *of her sex*, which is the relevant question. *See Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017).

Ms. McCarty argues that under both Title VII and the EPA she was treated less favorably than a similarly situated male employee, Mr. Myers, when Purdue paid him a higher salary between 2012-2019. "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quotations and citations omitted). If the distinctions between the plaintiff and the proposed comparators are not "so significant that they render the comparison effectively useless," the similarly situated requirement is satisfied. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007), *aff'd,* 553 U.S. 442 (2008). Normally a plaintiff must at least show that the comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008). Finally, the Supreme Court has stated that "precise equivalence . . . between employees is not the ultimate question." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n.11 (1976). But the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision. *Coleman*, 667 F.3d at 841.

The parties do not dispute that Ms. McCarty and Mr. Myers had the same supervisors throughout the relevant time period, had the same jobs, and performed them under the same conditions. It is also undisputed that Mr. Myers was paid more than Ms. McCarty. However, where the material difference between Ms. McCarty and Mr. Myers begins and ends is the

quality of their performance in their jobs. The Court incorporates by reference its analysis of the evidence regarding Ms. McCarty's performance evaluations, lack of merit-based raises, as well as the evidence regarding Mr. Myers' positive performance evaluations and merit-based raises in Section III.A. This evidence, which Ms. McCarty has not contradicted, is equally applicable to her Title VII claim and provides a nondiscriminatory explanation for the pay disparity. Ms. McCarty has presented no evidence to suggest that her pay was lower because she was a woman. As noted above, her only response to Purdue's motion on the Title VII claim was that she was treated differently than Mr. Myers, citing to no evidence and failing to respond to the legitimate, nondiscriminatory reason for the pay disparity. She has made no effort to argue that she was performing her job satisfactorily or that Mr. Myers is, in fact, a similarly situated employee. By failing to make these arguments, Ms. McCarty has waived them. *See Puffer*, 675 F.3d at 718 ("It is a well-established rule that arguments not raised to the district court are waived on appeal.").

Unlike Ms. McCarty's FMLA claim, she has not presented any evidence that Purdue's legitimate nondiscriminatory reason for her termination was pretextual nor does the Court find one in the record before it. When considering all the evidence, the Court does not find that Mr. Myers was similarly situated or treated more favorably than Ms. McCarty because the difference in their performance was a differentiating or mitigating circumstance as would distinguish Purdue's treatment of them. "To avoid Title VII sex-discrimination liability, [the Defendant] did not need to make wise or even generally fair decisions, so long as it did not discriminate on the basis of sex." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 630 (7th Cir. 2018). The Court finds that to be the case here, Ms. McCarty cannot demonstrate that her salary or treatment was discrimination on the basis of sex. Accordingly, the Court must grant Purdue's motion for summary judgment on Ms. McCarty's Title VII claim.

# IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the parties' cross-motions for summary judgment. [DE 45; 50]. The Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment as to the Equal Pay Act claim (COUNT I); GRANTS Defendant Purdue's motion for summary judgment as to the Fair Labor Standards Act claim (COUNT II) and DENIES Individual Defendants' and Plaintiff's motion for summary judgment as to that claim; GRANTS Purdue's motion for summary judgment and DENIES Plaintiff's motion for summary judgment as to the Indiana Minimum Wage Statute claim (COUNT III); GRANTS in part and DENIES in part Defendants' motion for summary judgment as to the Family Medical Leave Act claim (COUNT IV); and GRANTS Purdue's motion for summary judgment as to the Title VII claim (COUNT V). The Court GRANTS Defendants' motion to strike inadmissible evidence. [DE 60].

SO ORDERED.

ENTERED: September 1, 2021

                                     /s/ JON E. DEGUILIO
                                  Chief Judge
                                  United States District Court